JOSEPH K. EYRE AND ALGERNON E. ASHBURNER, EXECUTORS OF ELIZABETH E. POTTER, DECEASED *v.* SAMUEL R. POTTER AND MAUGER LONDON. .

Where a widow filed a bill in chancery, complaining that immediately upon the death of her husband, the son of that husband, together with another person, had imposed upon her by false representations, and induced her to part with all her right in her husband's estate for an inadequate price, the evidence in the case did not sustain the allegation.

It is not alleged to be a case of constructive fraud, arising out of the relative position of the parties towards each other, but of actual fraud.

The answers deny the fraud and are made more emphatic by the complainants having put interrogatories to be answered by the defendants, and the evidence sustains the answers.

It will not do to set up mere inadequacy of price as a cause for annulling a contract made by persons competent and willing to contract, and, besides, there were other considerations acting upon the widow to induce her to make the contract.

The testimony offered to prove the mental imbecility of the widow, should be received with great caution, and is not sufficient.

THIS was an appeal from the Circuit Court of the United States for the District of North Carolina, sitting as a court of equity.

The bill was filed by Elizabeth E. Potter, during her lifetime, to which her executors afterwards became parties.

The opinion of the court contains an explanation of the case as it is set forth in the bill, and it is not necessary to repeat it.

The cause was argued by *Mr. Badger* for the appellants, and by *Mr. Bryan* and *Mr. Graham* for the appellees.

The points of law which were raised by the counsel upon each side respectively, were so intermingled with their views of the facts and evidence, that it is impossible to separate them.

The view of the case presented on behalf of the appellants was as follows : —

The consideration of the deed, dated May 31, 1847, was evidently and grossly inadequate.

The defendant, Samuel R. Potter, in his answer admits that he had formed the opinion, that the estate of his late father was worth $120,000.

The statements and estimates in the answer of the said defendant, and the schedules therein referred to, show that the real and personal estate of the said Samuel Potter, at the time of his death, must have been nearly that sum. They certainly show that the estate was so large and valuable that the price agreed to be paid to the plaintiff for her interest therein, was shockingly inadequate.

In relation to the debts of the intestate, no account has been

filed by the administrator, Samuel R. Potter, and no vouchers exhibited or proved. If the witness Burr were competent to speak in a general way, when the vouchers and exhibits, if any, are withheld, then he proves that the whole amount of disbursements by the administrators was about $15,938: he is defendant's witness.

It is insisted, in behalf of the appellants, that her interest in the estate of her said husband was worth from $1,800 to $1,900 per annum, and from $13,000 to $14,000 absolutely. The result is arrived at from the answer of the defendant, Samuel R. Potter, and from the evidence in the cause. This valuable interest she transfers in the said deed for the sum of $1,000, in cash, and the personal covenant of the defendant, Samuel R. Potter, to pay her $600 per annum during her life, she being at the time nearly seventy years of age, and in infirm health. It is true, as stated in the answer of the defendant, Mauger London, that the defendant Samuel R. Potter, as administrator of the said Samuel Potter, afterwards allowed the plaintiff to obtain a decree or order in the proper court for her year's provision out of the said estate, and that said provision was of the value of $1,000, but this has nothing to do with the merits of said deed. It is also true that the said Samuel R. Potter, in the instrument executed by him, also covenants with the plaintiff to furnish her with a competent livelihood and maintenance at his own house, but nothing of this kind is mentioned in the said deed, dated May 31, 1847.

Notwithstanding the facts immediately above mentioned, it is still insisted, in behalf of the said plaintiff, that the consideration received by her, or secured to her for her interest in said estate, was grossly inadequate. The price of board and lodging in Wilmington, N. C., is from $20 to $25 per month in hotels and boarding-houses.

Mere inadequacy of consideration is not of itself a sufficient ground to set aside a contract, unless the inadequacy be such as amounts to apparent fraud, or unless the situation of the parties be so unequal as to give one the opportunity of making his own terms. A court of equity looks upon inadequacy of consideration as a mark of fraud or imposition ; and where the inadequacy is so gross as to excite an exclamation, &c., it is of itself proof of imposition. If, for instance, there be such inadequacy of price as that it must be impossible to state it to a man of common sense without an exclamation at its inequality, a court of equity considers that a sufficient proof of fraud to set aside the conveyance. 1 Bro. C. C. 9, &c.

If the inadequacy be such as to show that the person did not understand the bargain, or was so oppressed that he was

glad to make it, knowing its inadequacy, that shows a command over him amounting to fraud. Heathcote v. Paignon, 2 Bro. C. C. 175 ; Chesterfield v. Janssen, 2 Vez. 125.

The deed cannot be supported by evidence of the natural love and affection cherished by the plaintiff for her granddaughter Marion, who is the wife of the defendant, Samuel R. Potter.

The rules for determining upon a deed of sale, and a deed of gift are not the same in equity. Upon principle, therefore, where a deed purports to be a sale, the party interested therein cannot escape from the appearance of fraud by setting it up as a gift, and *vice versa.* Were this allowed, the court would be cheated, and its rules would be prevented or rendered unavailing by the arts of those very persons whom its rules were intended to reach. Though a deed may, in equity, be impeached by averments negativing the consideration therein expressed, yet the converse of the proposition does not hold good, and a deed cannot be supported by evidence of a consideration different from that expressed in the deed. 2 Hovenden on Frauds, 103, 43, 14, and cases there cited; vide 6 J. C. R. 232 ; 2 P. Wms. Rep. 204 ; Clarkson v. Hanway, 3 P. Wms. Rep. 129, n. ; Watt v. Green, 2 Sch. & Lef. Rep. 501 ; 2 Vez. Rep. 402 ; Chesterfield v. Janssen, 2 Vez. Rep. 125.

Indeed it may be said that, where a deed purports to be a valuable consideration, and the contrary is averred and proved, it is thereby falsified and discredited ; and it would be dangerous, if not absurd, to admit proof of averments in its support as a gift. These consequences would follow, that after the plaintiff has falsified the deed, and established by evidence that he was imposed upon when he put his seal to a false pretence of a sale, the defendant might escape and retain the spoils by admitting the falsehood of the deed, and thereby withdrawing himself out of the rules of the court, and insisting upon his own falsehood as the basis of a right to support the deed as a gift. A deed which expresses a valuable consideration, and no other, when impeached for inadequacy of price, cannot be supported by any evidence of natural love and affection. Vide 2 Hov. on Frauds, 14, 43, 102, and the cases there cited; Newland on Contracts, 359, 360, vide 2 Dev. Eq. 376; Jones v. Sasser, 1 D. & B. Rep. 452 ; 1 D. & B. Eq. 496 ; Chesson v. Pettijohn, 6 Ired. 121.

It ought to be remembered that the consideration of natural love and affection is not only not expressed in the deed, but it has not been proved, nor is any thing secured in the deed to the separate use of the granddaughter of the plaintiff.

There are many circumstances in this case, either admitted in

the answers or proved, which tend strongly to show fraud, imposition, and undue influence, practised upon the plaintiff at the time of the execution of the deed. She was at the time an old woman. The deposition of her son, Joseph K. Eyre, taken on the 15th day of November, 1848, shows that she was then sixty-nine or seventy years of age, and that she was always of a very weak mind and incompetent to transact business; and that her mind had been for many years, especially the last four or five years, materially affected by age, disease, and infirmity. And if any thing in addition were needed to show the incompetency and the imbecility of the complainant, it will be found in the allegation in Samuel R. Potter's answer, that she said she knew all about her husband's estate, and its value, and the value of her own interest in it, at the very time when she was parting with that interest for a consideration so utterly inadequate.

The same facts are in substance proved by the depositions of Emma L. Allibone, Maria Ashburner, Anna Worrell, J. L. Kay, E. C. Crowley, Josephine K. McCammon, Hannah B. Drummond. The same witnesses prove that the plaintiff had, at the date of the said conveyance, five children, one of them insane, and two of them in indigent circumstances.

They also prove that she was a tender and affectionate mother, and by no means so destitute of sensibility, as the defendants and some of their witnesses have insinuated.

The said deed bears date two days after the death of the husband of the plaintiff, before she could have an opportunity to reflect deliberately upon the very important step which she was about to take, before she could consult with her friends, and when her feelings must have been too much disturbed and agitated to enable her to act with care and caution in the disposition of her property.

Her mind could hardly have been calm and composed immediately after the burial of her husband, whether she lived happily with him or not. She resided in the house of the defendant, Samuel R. Potter, and was without money enough in her pocket to pay for a piece of mourning. At such a time, and under such circumstances, the plaintiff might easily have been imposed upon by her step-son and the other defendant, and it seems she had no aid from any other person prior to the date of the conveyance. On Sunday morning no one was present but the defendant Potter and his wife, and when the agreement was entered into, nobody was present but the plaintiff and the defendant Potter.

At the time when the deed was signed, no one was present but the plaintiff, the two defendants, and Mrs. Potter.

The depositions of Everett, Baker, London, and others, show that the plaintiff was not the object of affection to the family of her deceased husband.

There was unusual haste in making the contract and in the execution of the deed. The husband of the plaintiff died on Saturday, was buried on Sunday, and the contract was completed and the instrument signed on Monday morning.

The said deed makes a disposition of all the property of the plaintiff.

The conveyance was in a very high degree unwise and imprudent, as regards the plaintiff, and unjust and unnatural towards her children, two of whom were poor, and one of them insane.

A disposition of property so revolting to common sense and natural affection ought to be looked upon with suspicion. If the plaintiff married her late husband under the influence of the mercenary motives which have been attributed to her, the execution of the said deed would be no less extraordinary and unaccountable. If property was so dear to her, why should she dispose of it upon such ruinous terms, if she in fact understood what she was about? The parties did not deal with each other upon equal terms. The defendant Potter was much more competent than the plaintiff to transact business, and was much better acquainted with the estate. He admits in his answer that he had had the management of a portion of his father's property, to wit, the rice plantation, known as Point Peter, and Love Grove, and the hands belonging to the same.

The defendant, Potter, misrepresented the value of the estate to the plaintiff, before she signed the deed. The defendant, Potter, says in his answer that, on Monday morning, 31st of May, 1847, the plaintiff said that she had concluded to sell her interest in her husband's estate to him for the benefit of her granddaughter. How then does it happen that the property was not conveyed for the benefit of the granddaughter of the plaintiff? By what influence did she sign a deed contrary to her own conclusion and in violation of the agreement? Where, and when, and with whom, and for what price, did she consent to change her purpose?

This pretended consideration of love and affection for her granddaughter, at the expense of her more needy and equally beloved children, was probably introduced to save the agreement from the imputation of shocking inadequacy, but like all similar pretexts, it puts upon the deed a brand of fraud and a mark of surprise or imposition. Neither by general nor special words does this leading motive find a place in her deed, and yet she signed it, according to the statement of the defendant Pot-

ter, gladly and eagerly. The name of Mrs. Marion Potter is not even mentioned in the deed.

Again. The defendant, Potter, says the bargain was that he would pay her one thousand dollars in cash. How happens it that the writing only gave her his note without interest, and left her obliged to borrow money from her granddaughter to buy clothes?

Again. Said defendant says that the bargain was that he would " give her board," as a part of the price. How does it happen that the covenants for her board and the other writings, do not recite this as a part of the price, but, on the contrary, recite that she is to be boarded at the house of said defendant, simply because she " deserved it," thereby making it a voluntary covenant? And wherefore did plaintiff consent to turn her privilege of boarding with Marion into a condition that she was to board with Mr. Potter, no matter whither he might go?

Again. Said defendant says that the agreement was, that he was to " find her a servant." Why is this omitted in the writings?

Again. The said defendant says that it was a part of his original agreement with the plaintiff, that she was to have her year's allowance. And yet she conveys away her entire interest in the estate.

The statements of the two defendants concerning the circumstances attending the transaction, do not in all respects agree with each other, and their statements are in many respects extraordinary and suspicious.

The deed, dated June 21, 1847, is no confirmation of the deed previously executed by the plaintiff. It is not relied upon as a confirmation. But if it were relied upon as such, there is a ready answer. On the 21st of June, 1847, the defendant, Samuel R. Potter, was administrator of his father, Samuel Potter, and supposing his deed of the 31st of May, 1847, to be void, he was a trustee of the property in his hands, and by the established rules of a court of equity, this agreement could not stand for a moment, at least so far as the personal estate is concerned.

In order to make an express confirmation available, it must appear that the party was then aware of his rights, and knew that the first transaction was impeachable. Lord Chesterfield *v.* Janssen, before cited; Boyd *v.* Hawkins, 2 Dev. Eq. Reps. 215.

If it be competent to look beyond the deed itself for a consideration to support it, and if there be sufficient proof to show that natural love and affection for the wife of the defendant Potter, constituted any part of the consideration, then the deed,

dated 31st of May, 1847, ought to be considered as a gift so far as it conveys any thing over and above the value of the price paid or secured, and it ought to be governed by those rules which relate to voluntary conveyances.

## Competency of Evidence.

It is insisted by the plaintiff that the deposition of Mauger London, one of the defendants, is not competent, because his answers were written by him, before he came before the commissioners.

Plaintiff insists that the correspondence between herself and her children, after the execution of the deed, dated May 31, 1847, is competent.

The defendant, Potter, in his answer says, that she received letters reproaching her before the 21st of June, 1847. The letters are thereby made evidence to disprove it. Defendant Potter said she loved none of her children; said letters are evidence to show the contrary. Said letters are evidence to discredit London, witness for the defendant, Potter.

The counsel for the appellees made the two following points, before examining the case upon its merits:

1st. The rights of these very parties have been adjudicated upon in a State court. Potter *v.* Everett, 7 Iredell, Eq. Ca. 152.

2d. All the children, and the grandchild of Samuel Potter, the deceased, intestate, who are his heirs at law, and next of kin, ought to be parties to this suit. Story's Eq. Pl. sect. 72 to 76, inclusive; Poor *v.* Clark, 2 Atk. 515; Mitford, Eq. Pl. by Jeremy, 164.

As to the merits: These depend upon the pure principles of English equity. There is nothing in the jurisdiction of this court, or the laws of the State from which it comes, to give to it any peculiarity. And its solution involves, mainly, the question, what guardianship, either for relief or restraint against their own action, do courts of equity assume over persons of either sex, who are of mature age, of sound mind, and, in the case of women, not under coverture.

The execution of the deed, which it is sought by this bill to set aside, being admitted, it must stand here, as in a court of law, unless there were circumstances attending its execution which establish fraud and surprise in its procurement. The circumstances relied on are stated in the bill, from the lower part of page 2 to 5 of the record; and, as summed up in the brief of the plaintiff's counsel, are, that on the 31st of May, 1847, when the deed was executed, she was sick, nervous, and

afflicted; without counsel; ignorant of her rights, and of the value of the estate of her husband; not competent to transact business; that the defendants availed themselves of the advantage afforded by this, her condition, and surprised and defrauded her into the execution of the deed, disposing of her whole worldly estate for a greatly inadequate consideration; and that the value of her interest in her husband's estate was misrepresented and underestimated by the defendants, Samuel R. Potter and London, who was his attorney.

The answers of both defendants are directly responsive to the bill, and both deny every material allegation in support of these charges, and explain every fact relied on to give them color. They deny that she was sick, nervous, or afflicted, to their knowledge, during the illness, or at the time of the death, of her husband, or at the time of the execution of the deed. On the contrary, they state circumstances, showing ordinarily good health, and extraordinary indifference and composure. They deny that she was ignorant of her rights, and of the value of the estate of her husband, and that she was not competent to transact business. They both state that she informed them, in conversation, that she had managed two estates of deceased persons in Philadelphia, before her marriage to Samuel Potter; that the defendant, London, expressly informed her of her legal rights, as the widow of her husband, before her execution of the deed; that she declared she knew what the estate was worth; verified this declaration by enumerating most of the articles of property of which it consisted, and said the whole was worth $130,000, and that her dower was worth $1,000 a year, (all of which, defendants allege is an overestimate,) but that a primary motive with her for making the conveyance, was to benefit her granddaughter, the wife of the defendant, Potter, and himself.

As to being without counsel, they respond, that she was cautioned by the defendant, London, as to the importance of the business, and advised to call in D. B. Baker, Esq., an eminent lawyer, and P. K. Dickinson, Esq., an eminent man of business, both of whom were near to her house, the former, the son-in-law, and the latter, a partner of her late husband; but that she declined, preferring to act on her own judgment, and desiring to keep the affair secret.

They deny, secondly, that either of them misrepresented or underestimated the value of her interest in the estate of her husband, or advised or influenced her to make the conveyance in question; but, on the contrary, they aver, that the whole arrangement originated with, and was proposed by her first, while the funeral ceremonies of her husband were in progress, and was persevered in and carried out with perfect composure and deli-

beration. They deny that London was the attorney of S. R. Potter in general, or of the intestate Samuel Potter. The former states that he was averse to employing London as his counsel, in conducting the administration of his father's estate, and only consented to retain him upon the advice of his brother-in-law, the aforesaid D. B. Baker, himself a lawyer. They state that she, on returning from her husband's burial, requested London to call and see her the next morning on particular business; that he did so call; that she then mentioned the sale she proposed to make of her interest in her husband's estate to Samuel R. Potter, and gave him instructions to prepare the conveyances; that whatever circumstances of secrecy attended his visits to her house, were occasioned by her special request. They admit that the pecuniary consideration recited in the deed was not equal to the interest thereby conveyed, but allege that the plaintiff was so told by both of them, and was well aware of that fact, as she then declared, from her own knowledge of the estate. They state that the plaintiff, at the time of its execution, was well satisfied with her deed, and so continued until, a few weeks thereafter, she received a letter from her relatives in Philadelphia, complaining that she had made no provision for her lunatic daughter, Mrs. Babcock. This becoming known to the defendant, Potter, he told the plaintiff if she was dissatisfied with what she had done, he would surrender the deed to her. She declined this; but it was then agreed that the defendant, Potter, should pay to the said Mrs. Babcock an annuity of $150 per year, to commence immediately on the death of the plaintiff, and that the plaintiff should therefore confirm the conveyance to him ; that she then sent again for the defendant, London, gave him instructions for written instruments to carry this agreement into effect, and that the annuity bond being signed by the defendant, Potter, she then, to wit, on the 21st of June, 1847, by her solemn deed, reaffirmed the conveyance of the 31st of May preceding. They deny that this last arrangement was made by either of the defendants with a view to avoid odium, which had been incurred by them on account of the original conveyance; but the defendant, Potter, alleges, that he entered into it because the plaintiff had been liberal to him, was and expected to continue an inmate of his family, and to enable her to silence the reproachful clamors of her friends in Philadelphia ; that, upon its being completed, she professed herself fully satisfied, and said her Philadelphia friends could no longer complain.

Thus the parties are at issue, and the decree to be rendered depends wholly upon the finding of the facts as alleged by the one party or the other. The judges in the court below found in favor of the defendants. This being a court of errors in law,

will not reverse the decision there made upon a mere difference of opinion as to the conclusion to be drawn from the evidence upon the facts.

But supposing the questions of fact to be retried here, what evidence is there to sustain any material allegation in the bill, or to contradict any material averment in the answers?

That of the plaintiff consists mainly of the depositions of certain persons in Philadelphia, (for the most part her children and connections,) who depose that she had children by her first marriage, and manifested for them, in her intercourse, the usual family affection; that she was a delicate person, not of strong mind, and had some relatives who were lunatics; and that she could not transact business; that the defendant, Potter's wife, is the daughter of a man of wealth, and has an estate independently of her father, and that the plaintiff had no estate, except her interest in the fortune of her husband.

In addition to these, she has taken the depositions of certain persons in Wilmington, which are found in the record, to show of what her husband's estate consisted, what was its value, the relations of friendship between S. R. Potter and London, and the state of London's credit in 1847, &c.

There is no witness who supports the allegations of her bill, which constitute her claim to be relieved, against her solemn deed, by the rules of justice administered in courts of equity. Namely, that at the time of its execution she was sick, run down with fatigue and watching, distressed, ignorant of her rights concerning her husband's estate, and of the value thereof, in need of counsel, which she would have had but for the fraudulent acts of the defendants; that the defendants, or either of them, misrepresented or underestimated the amount of the estate, almost all the articles of which are enumerated in her deed; or that they, or either of them, advised or urged her to make the conveyance to the defendant, Potter; or that the defendants conspired or colluded to defraud her. The bill should therefore be dismissed, for want of proof to sustain its material charges, which are contradicted by the answers of the defendants. The answers being directly responsive to the allegations and interrogatories of the bill in evidence for them, which must prevail, unless overborne by the testimony of two witnesses, or its equivalent. Story's Eq. 528; Lewis *v.* Owen, 1 Ired. Eq. Cas. 290; Arnsworthy *v.* Cheshire, 2 Dev. Eq. 456. But the defendants have, moreover, disproved the plaintiff's charges by positive testimony. Their depositions show that the plaintiff was not sick, distressed, fatigued, or in anywise disconcerted by the sickness or death of her husband; that the defendant, Samuel R. Potter, was much grieved; that she was well acquainted with her hus-

band's estate, and estimated it at its full value. That she told a witness, on her return from her husband's burial, on Sunday, that she had determined on the disposition of her property as conveyed by this deed. That she had been reading the Revised Statutes the same day while the company was at the burial. That she made a similar declaration to another witness, on the next morning, before London came to her house. That she afterwards expressed satisfaction with this arrangement, and gave good reasons for it: Namely, 1st, that she was much attached to Mrs. S. R. Potter, and intended to live with her; 2d, that she had made over her property to her children, at the time of marrying Mr. Potter, and thought it but right that his children should have his; 3d, that most of his property consisted in slaves, and she would not own one for any consideration. 4th, that the management of the property would be troublesome to her, and that the amount to be paid her by Potter was as much as she wanted. 5th, that Samuel R. Potter might be enabled to buy the Point Peter plantation, and thus have an ample provision for his wife. The deposition of D. B. Baker, taken by plaintiff, shows that she was a person of bad disposition and temper, self-willed, and dictatorial. They prove, also, that she was content with the disposition of her property until she received a letter from her son, Joseph Eyre, in Philadelphia. That upon the new arrangement being made, by which an annuity was secured to her daughter, Mrs. Babcock, she was entirely satisfied, and deliberately ratified her conveyance, with a full knowledge of every thing pertaining to the subject. This was on the 21st of June. In August ensuing, her son, Joseph Eyre, came to Wilmington, and she left with him for Philadelphia.

Aware of the effect of these proofs, the learned counsel for the plaintiff devotes the main stress of his argument to the inadequacy of the consideration of the deed, as a ground of relief. It will be insisted that the inadequacy, though considerable, is not gross, and that, regard being had to the nature of the property, and the relative capacities of the plaintiff and Samuel R. Potter to render it profitable, the arrangement as a sale was not so disadvantageous to her as it has been represented. With this object, reference will be made to the inventory of the administrator. But suppose the inadequacy, as a question of pecuniary value, to be gross, it alone affords no ground for relief, and requires some other accompaniment to taint the deed with fraud. 2 Coxe, 320; Coles *v.* Trecothick, 9 Ves. 246; Underhill *v.* Howard, 10 Ves. 219; Lord Thurlow, in Fox *v.* Macreth, 16 Ves. 512, 517; Story's Eq. 245; Burrowes *v.* Lock, 10 Ves. 471; Greene *v.* Thompson, 2 Ired. Eq. 365; Moore *v.* Reid, Ib. 580; Osgood *v.* Franklin, 2 Johns. C. R. 23. There is

no such accompaniment here. On the contrary, it is clearly shown that the pecuniary consideration was accompanied by that of affection. It is said that this circumstance cannot be taken into the account, because it only appears by parol evidence, and thus to prove it violates the rule that parol evidence cannot be received " to vary, add to, or contradict " a deed. The fallacy of this argument consists in applying a salutary rule in the construction of deeds, and the determination of rights under them, to inquire into the fraud or fairness of their execution; in fact, to the inquiry whether the alleged deed is a deed. If this circumstance attending the execution cannot be proved by evidence *dehors* the deed, what other can? How does the consideration appear to be inadequate, but by parol evidence? Is it to be allowed to impeach but not to sustain? In investigations of this kind nothing is excluded which shows the acts or motives of either party. That it is admissible for this purpose is considered as settled. Springs *v.* Hawks, 5 Ired. 33; 6 Ired. Eq. 38; 1 Phillips on Ev. 482, n. and cases cited; 3 Stark. Ev. 1004, *et seq.;* 1 Greenleaf, 408; 2 Story's Eq. 1531; Sugden on Vendors, 87; Potter *v.* Everitt, 7 Ired. 152; Hinde *v.* Longworthy, 11 Wheat. 199; Runyon *v.* Leary, 4 Dev. & B. 233. Even conveyances, voluntary on their face, may be shown by parol to have been for valuable consideration, and thus defeat the claims of creditors. Sugden, 438; Chapman *v.* Emery, Cowp. 278. And the cases are numerous where conveyances, absolute in their terms, have been allowed, by parol, to be shown to be mere securities for money. Streder *v.* Jones, 3 Hawks, 423; 2 Dev. 558; 1 Ired. Eq. 369; 6 Ired. Eq. 38. The cases cited by the plaintiff's counsel on this point do not sustain his position.

There is a well-established distinction between the cases in which a specific performance will be refused in equity, where a contract is executory, and those in which it will be rescinded being executed. The circumstances of this case may class it with the former, but not the latter.

But, whatever may be thought in regard to the original transaction, there has been such complete recognition and confirmation on the part of the plaintiff that she cannot impeach her deed. Moore *v.* Reid, 2 Ired. Eq. 580; Chesterfield *v.* Janssen, 2 Ves. 125; Cole *v.* Gibbons, 3 P. W. 289.

### As to Competency of Evidence.

Loudon's deposition was properly allowed as evidence. After the certificate of the commissioners, dated April 14, 1849, of the execution of their commission, they were *functi officio,* and no other certificate of theirs can be heard. If they are to be fur-

5*

ther heard, it must be upon oath as witnesses. But if their certificate of the 12th November, 1844, is to be respected, the fact it sets forth is neutralized by their third certificate, on the same page that the irregularity of writing out the answers of witness, while out of their presence, was occasioned by themselves.

No observation is deemed necessary on the complaint, that the plaintiff was not permitted to introduce as evidence the correspondence between herself and her children.

Mr. Justice DANIEL delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the District of North Carolina, by which decree the bill of the appellant (the complainant in the Circuit Court) was dismissed with costs.

The allegations in the bill, on which the interposition of the court was invoked, are substantially as follow: That Samuel Potter, deceased, the late husband of the complainant, died on the 29th of May, 1847, possessed of a large real and personal estate, consisting of houses in the towns of Wilmington and Smithville, in North Carolina, of a productive rice plantation, of an interest in one or more valuable saw-mills, of a large number of slaves, of a considerable amount of bank and railroad stocks, and of other personal property; that the complainant who, at the time of her husband's death, was ignorant of the value of his property, had, from recent information, ascertained that the annual value of the real estate was more than $6,000, perhaps equal to twice that sum, and that her share in her husband's personal property was worth not less than $15,000; that by the laws of North Carolina the complainant, in addition to one year's maintenance for herself and family, (in this instance amounting to not less than $1,000,) was entitled, in right of her dower, to one third of her husband's real estate during her life, and to an absolute property in a child's part, or one sixth of the personalty, her husband having left surviving him four children and one grandchild; that by the laws of the same state, she had the prior right of administration upon the estate of her husband, and thereby the control of his assets, and a right to all the regular emoluments resulting from that administration; that the complainant is an aged and infirm woman, predisposed to nervous affections, and wholly inexperienced in the transaction of business; that during the last illness of her husband, being overwhelmed by daily and nightly watchings and anxiety, she became ill; that, whilst she was thus sick and oppressed with affliction and infirmity, Samuel R. Potter, the son of her late husband, professing great sympathy and affection for the complainant, availing himself of her dis-

tressed and lonely condition, and of her ignorance of the value of the estate, with which he was familiar, having been several years the manager of it, combined with a lawyer by the name of Mauger London to defraud the complainant, and to deprive her of her rights and interest in the estate, and succeeded in accomplishing this scheme in the following manner: In the prosecution of their plan they in the first place induced the complainant under an assurance that the measure would be in accordance with the wishes of her late husband, and would prove the best means of protecting and securing her interests, to relinquish to the said Samuel R. Potter, her right to administer upon her husband's estate. In the next place by false representations as to the value of the estate, and the expense and trouble of managing it, they prevailed upon her to sell and convey to the said Samuel R. Potter, by a deed bearing date on the 31st of May, 1847, her entire interest in this wealthy and productive estate, for the paltry consideration of $1,000, and a covenant for an annuity of $600 during the complainant's life; and that even this small allowance was not otherwise secured to the complainant than by the single bond of said Samuel R. Potter, for the sum of $2,000. That in the eagerness to effect their iniquitous purposes, the said Potter and London, in total disregard of her feelings and even of decency, did, on the day of her husband's death and before his interment, urge her acquiescence in their scheme, and on that day or the day succeeding, accomplished it, by extracting from the complainant a deed bearing date on the 31st of May, 1847, conveying to Samuel R. Potter the complainant's entire interest in her late husband's estate, and the instrument of the same date, whereby she relinquished to the same individual her right to administer upon that estate. The bill makes defendants the said Samuel R. Potter and Mauger London; charges upon them a direct fraud by deliberate combination, by misrepresentation, both in the suppression of the truth and the suggestion of falsehood, and in the effort to profit by the ignorance, the sickness, the distress and destitution of the complainant. The bill calls for a full disclosure of all the facts and circumstances attending the transactions therein alleged to have occurred; prays that the deed of May 31st, 1847, from the complainant to said Samuel R. Potter may be cancelled; that the property thereby conveyed may be released and reconveyed to the complainant, and concludes with a prayer for general relief.

It is now the office of this court to determine how far the foregoing allegations are sustained upon a proper construction of the pleadings, or upon the evidence adduced by either of the parties

And here it may be proper to premise, that in the examination of the case made by the bill, it cannot be considered as one of constructive fraud, arising out of some peculiar relation sustained to each other by the complainant and the defendants, and therefore to be dealt with by the law under the necessity for protecting such relation, but it is one of actual, positive fraud, charged, and to be judged of, according to its features and character, as delineated by the complainant, and, according to the proofs adduced to establish that character. Although cases of constructive fraud are equally cognizable, by a court of equity, with cases of direct or positive fraud, yet the two classes of cases would be met by a defendant in a very different manner. It seems to be an established doctrine of a court of equity, that when the bill sets up a case of actual fraud, and makes that the ground of the prayer for relief, the plaintiff will not be entitled to a decree, by establishing some of the facts quite independent of fraud, but which might of themselves create a case under a totally distinct head of equity from that which would be applicable to the case of fraud originally stated. In support of this position may be cited, as directly in point, the case of Price *v.* Berrington, decided by Lord Chancellor Truro, in 1851. *Vide* English Law and Equity Reports, vol. 7, p. 254.

The defendants, in this case, were clothed with no special function, no trust which they were bound to guard or to fulfil for the benefit of the complainant; they were not even the depositaries of any peculiar facts or information as to the subject matter of their transactions, or which were not accessible to all the world, and by an omission or failure in the disclosure of which, they could be regarded as perpetrating a fraud.

Recurring to the pleadings in this case, there is not alleged in the bill one fact deemed material to the decision of this controversy, which is not directly met, and emphatically denied, by both the defendants.

Although the age assumed for the complainant seems to be controverted by none of the parties, yet the assertions that, at the period of her husband's death, she labored under any unusual infirmity; that she was exhausted by fatigue and by anxious watchings at the bed of sickness, or was overwhelmed with grief, or even discomposed by the event which severed forever her connection with her husband, are assertions directly met, and positively contradicted; and in further contravention of these statements by the complainant, are the averments that the intercourse of the complainant with her late husband, was of a very unhappy character, evincing not indifference merely, but signs of strong antipathy. Equally di ct and positive are the denials in the answers of both the defendants, of the charges of

Eyre et al. *v.* Potter et al.

persuasion or inducement of any kind, or of any concealment or misrepresentation moving from the defendants, by which the complainant was or could have been influenced; and it is expressly denied by each of the defendants, that any proposition was by them, or either of them, submitted to the complainant for the sale of her interest in the estate, or for the relinquishment of her right to the administration. These positive denials in the answers, being directly responsive to the charging part of the bill, the latter, by every rule of equity pleading, must be displaced by them, unless those denials can be overcome by evidence *aliunde.* But by the peculiar frame and structure of the bill, in this case, the complainant has imparted to the answers, a function beyond a mere response to the recitals or charges contained in the bill. The complainant has thought proper specifically to interrogate the defendants, as to the origin, progress, and conditions of the transactions impugned by her; and as to the part borne in them, both by the defendants and the complainant herself. By the answers to these interrogatories, the complainant must, therefore, be concluded, unless they can be overthrown by proofs. How stands the case, in this aspect of it, upon the interrogatories and the evidence? The defendants, being called on to disclose minutely, and particularly, their knowledge of, and their own participation and that of the complainant in, the transactions complained of, declare, that when those transactions took place, the complainant was in her usual health; was in possession of all her faculties, was exempt from any of those influences, such as grief and depression, which might have rendered her liable to imposition; was in possession, likewise, of all the knowledge as to the subject-matter of the transactions requisite to judge of her own interests; that with such capabilities, and such knowledge, the complainant herself proposed the arrangement which was adopted, and although informed by both the defendants, that the consideration she proffered to receive was less than the value of her interests in the estate, she urged and insisted upon that arrangement, assigning for it, reasons, which are deemed neither unnatural nor improbable, and which, although they might, to some persons, appear not to be judicious, she had the right, nevertheless, legally, and morally, to yield to.

How does the history, thus given by the defendants, accord with the proofs in this cause?

And first as to the state of complainant's health, and the condition of her mind and spirits as affected by the illness and death of her husband.

Benjamin Ruggles, who says that he is acquainted with the parties, states that he was with the husband of the complainant

every day during his illness, (which lasted eight or ten days,) and sat up with him two nights; that he saw the complainant every day; that she did not sit up either night that the witness was there; that she exhibited no sign of distress at the sickness of her husband, nor devoted much of her time to him, nor showed any sign of grief at his death; that on the night of her husband's death, the complainant attended to getting his burial-clothes, which she handed to the witness, seeming calm and composed. The complainant was not sick during the witness's stay.

Josephine Bishop, also acquainted with the parties, was at the house of the deceased on the day of his death, returned there on the second day after that event, and remained three or four weeks. On the morning of the witness's return, the complainant, in a conversation, informed her that complainant intended to propose to the defendant, Samuel E. Potter, to make over to his wife all the complainant's interest in her husband's estate. Some two or three weeks after, the complainant said to the witness that she had sent for Mr. London to arrange her business for her, and felt greatly relieved and satisfied at the manner in which he had arranged it; that she had conveyed her interest in her husband's estate to Samuel R. Potter, who was to give her two thousand dollars in cash, six hundred dollars a year during her life, to furnish her board and a servant, and would have given her more if she had asked it, but she was satisfied with the amount, which was as much as she would have use for. The complainant spoke of the defendant, London, in the strongest terms of approbation. She farther remarked to the witness, that she knew her interest in the estate of her late husband was worth much more than she had asked for it. Yet at the time of her marriage with him, she had made over her own property to her children by a former marriage, and thought it nothing but right that his children should have the benefit of his property, besides that the greater part of the property consisted of slaves, and she would not own one for any consideration. Witness saw the complainant every day during the time she was at the house; she did not complain of ill health nor appear to be at all distressed; and witness had never seen her in better spirits. The conversations in which these declarations of complainant were made, were introduced by the complainant herself.

Margaret H. Wade, who is acquainted with the parties, states that she was three or four times at the house of defendant during his illness, and remained three or four hours during each time. Witness saw the complainant once only in the room of her husband; she staid in an adjoining room. Witness did not perceive that the complainant was indisposed in any way, nor

did the complainant appear to be grieved during the illness of her husband nor after his death. In a conversation with witness some three or four days before decedent's death, the complainant asked the witness if she thought the decedent could live, and upon the reply of the witness that she did not think he could, the complainant observed that she was provoked at Samuel (the defendant) for forcing him to take first one thing and then another, "and make him live any how." Afterwards, on board of the steamboat returning from Smithville from the funeral of the decedent, the complainant told the witness, that she had made over her property to Samuel R. Potter, or intended so doing, on account of his wife Marian; that she was very fond of her, and wished to stay with her the residue of her life, though she did not know that her friends at the north would be willing that she should do so.

Without a farther and more protracted detail of the testimony adduced on the part of the defendants, it may be sufficient merely to advert to the depositions of Julia and Caroline Everett, of Edwin A. Keith, and of Sterling B. Everett, (the last for many years the physician in the family of the decedent,) and of the complainant herself, as fully sustaining the averments in the answers of the defendants, and the statements of the witnesses previously named, in relation to the capacity of the complainant, to her disposition and deportment towards her late husband, the effect of his illness and death upon her health and spirits, her knowledge of her rights and interest in the subject of her transactions with the defendants, the origin and fairness of those transactions, the objects for which, and the means and instrumentality by which, they were consummated. Nor can it escape observation, as a circumstance of great if not of decisive weight, that all this testimony is derived from persons familiar with the parties, living upon the immediate theatre of the transactions in controversy, many of them more or less acquainted with the subjects embraced by them, witnesses, all of them free from imputation on the score of interest, and against whose veracity or intelligence no exception is even hinted.

Against an array of evidence like this, the question of equivalents or of exact adequacy of consideration cannot well be raised. The parties, if competent to contract and willing to contract, were the only proper judges of the motive or consideration operating upon them; and it would be productive of the worst consequences if, under pretexts however specious, interests or dispositions subsequently arising could be made to bear upon acts deliberately performed, and which had become the foundation of important rights in others. Mere inadequacy of price, or any other inequality in a bargain, we are told, is not to

be understood as constituting *per se* a ground to avoid a bar-gain in equity, for courts of equity, as well as courts of law, act upon the ground that every person who is not, from his pe-culiar condition or circumstances, under disability, is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargains are wise and discreet or otherwise, or profitable or unprofitable, are considerations not for courts of justice, but for the party himself to deliberate upon. Vide Story's Equity, § 244, citing the cases of Griffiths *v.* Spratley, 1 Cox, 383, Copis *v.* Middleton, 2 Maddox, 409, and various other cases.

Again, it is ruled, that inadequacy of consideration is not of itself a distinct principle of equity. The common law knows no such principle. The consideration, be it more or less, sup-ports the contract. Common sense knows no such principle. The value of a thing is what it will produce, and it admits of no precise standard. One man, in the disposal of his pro-perty, may sell it for less than another would. If courts of equity were to unravel all these transactions, they would throw every thing into confusion, and set afloat the contracts of man-kind. Such a consequence would of itself be sufficient to show the injustice and impracticability of adopting the doctrine, that mere inadequacy of consideration should form a distinct ground for relief. Still, there may be such an unconscionable-ness or inadequacy in a bargain, as to demonstrate some gross imposition or some undue influence; and in such cases courts of equity ought to interfere, upon satisfactory ground of fraud; but then, such unconscionableness or such inadequacy should be made out as would, to use an expressive phrase, shock the conscience, and amount in itself to conclusive and decisive evi-dence of fraud. Vide Story's Equity, § 245 – 246, and 9 Ves. 246; 10 Id. 219; and other cases there cited.

But the contract between the parties in this case should not be controlled by a comparison between the subject obtained and the consideration given in a mere pecuniary point of view; ad-ded to this, were the motives of affection for the wife of the grantee, the granddaughter of the grantor, a conviction in the latter of what justice dictated towards the children of the de-cedent in relation to his property; the prospect of ease and independence on the part of this elderly female; her exemption from the expense, the perplexities, and hazards of managing a species of property to the management of which expense and energy and skill were indispensable; property to the tenure of which she entertained and expressed insuperable objections. Here, then, in addition to the sums of money paid, or secured to be paid, we see considerations of great influence which,

naturally, justly, and lawfully, might have entered into this contract, and which we think cannot be disregarded in its interpretation, upon any sound construction of the testimony in the cause. Upon the first view of this case, it may, in the spectacle of the widow and the son bargaining over the unburied corpse of the husband and the father for a partition of his property, be thought to exhibit a proceeding revolting to decorum, and one, therefore, which a court of equity, equally with a court of morals, would be cautious in sustaining, or be inclined to condemn; yet, upon testing this proceeding by any principle of decency, as well as of law or equity, it is manifest that it could not be disturbed without benefit to the chief offender against such a test; for the evidence incontestably shows, that whatever in the conduct of the parties was inconsistent with the highest and most sacred relations in life — whatever may be thought to have offended against the solemnity and decorum of the occasion, — was commenced and pressed to its consummation by the plaintiff in this case. Tried, then, by this standard, she should be left precisely where she has placed herself.

To avoid the consequences flowing from the acts of the complainant touching the matters of this controversy, the testimony of several witnesses, taken in the city of Philadelphia, has been introduced, to prove the mental as well as physical incompetence of the complainant. With respect to the character and purposes of this testimony, it may be remarked, that a position in a court of justice founded upon what is in effect the stultification of the person who assumes that position, is one to be considered with much diffidence, as it admits in general the *factum* which it seeks to invalidate; and if the averments on which such position rests be true, the person occupying that position should be in court by guardian or committee. But in truth this testimony establishes no such position, either directly or inferentially, in reference to the complainant. In the first place, all these witnesses resided in a different State, and at the distance of many hundreds of miles from the complainant; and not one of them appears to have had any intercourse with her or to have seen her even for a series of years preceding the contract which it is essayed to vacate; nor to have had any knowledge of the existence of that contract until after its completion; nor of the state of mind or of the health of the complainant at the period at which that contract was found. In addition to this ignorance of these witnesses, of the transaction under review, and of all the circumstances surrounding it, there is no fact stated by one of them which amounts to proof of incapacity on the part of the complainant to comprehend the character of her acts, and of the legal consequences incident to

them; and much less do they establish, as to her, such an aberration or imbecility of mind as would justify a presumption, and much less a legal conclusion, against the validity of any and every act she might perform. To such a conclusion only could the general expressions of opinion and belief of these witnesses apply, and such a conclusion they come very far short of establishing.

We are therefore of opinion, that the decree of the Circuit Court should be affirmed, and the same is hereby affirmed with costs.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of North Carolina, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.