PACIFIC MAIL S. S. CO. v. WAIMANALO SUGAR CO.

(Circuit Court of Appeals, Ninth Circuit.    October 3, 1910.)

No. 1,839.

SHIPPING (§ 75*)—HIRING—COMPENSATION—SERVICES RENDERED TO STRANDED VESSEL.

Libelant, as owner of a steam schooner which, at respondent's request, took off and landed the passengers of respondent's steamship Manchuria after her stranding in the bay of Waimanalo on the island of Oahu, Hawaii, *held* entitled to extra compensation therefor as for extraordinary or emergency service, in view of the attendant danger because of the roughness of the sea and the position of the Manchuria on the reef, but not to any extraordinary allowance for services subsequently rendered in transporting baggage, supplies, etc., to and from the steamship after libelant's representative had been asked and had refused to fix a price for the use of the schooner, and which services were not of an extraordinary or dangerous character.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 75.*]

Appeal from the District Court of the United States for the Territory of Hawaii.

Suit in admiralty by the Waimanalo Sugar Company against the Pacific Mail Steamship Company. Decree for libelant, and respondent appeals. Modified.

Kinney, McClanahan & Derby and Holmes, Stanley & Olsen, for appellant.

Nathan H. Frank, Irving H. Frank, Smith, Warren & Hemenway, and Henry E. Cooper, for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. This case grew out of the stranding of the Pacific Mail steamship Manchuria on a coral reef in the bay of Waimanalo, on the northeasterly side of the island of Oahu, on the 20th day of August, 1906, the details of which stranding are set forth in the case of Pacific Mail Steamship Company v. Commercial Pacific Cable Company, 173 Fed. 28, 97 C. C. A. 346. In the present case the appellee, which was the libelant in the court below, did not sue for salvage services, but brought its libel for services rendered by its steam schooner J. A. Cummings on that occasion at the alleged request of the agents of that company—such services being alleged in the libel to have been "of an extraordinary character, and rendered at the great risk, hazard, and peril to said steam schooner J. A. Cummings, and to the great benefit and advantage of said steamship Manchuria, her passengers, and cargo," and to have been reasonably worth $4,000.

The specific allegations of the libel are, in effect, that the Cummings, on the 20th of August, 1906, landed passengers and handbaggage from the Manchuria, carrying about 197 passengers in two trips; that on the 21st of August it was loading sugar, as was its custom, at Waimanalo, and, having placed on board about 400 bags, was by the agents of the steamship company requested to go to the Manchuria,

and in response to that request immediately went out and near to the stranded ship, but found the sea too rough to safely do anything, and consequently went on to Honolulu; that on the next day, the 22d, it took from the Manchuria and carried to Honolulu about 80 tons of passengers' baggage and 26 boxes of valuables, worth about $75,000; that on the 23d of August it carried anchors, cables, and other material to the Manchuria, and received baggage from her, which it transported to Honolulu; that on the 24th of August it carried supplies to the ship Restorer, which was then engaged in salving operations for the Manchuria; and that on the 25th, 26th, and 27th of August it remained at Honolulu, ready to respond, if wanted, under a general request from the agents of the stranded ship.

In its answer the steamship company set up that the only work of the schooner Cummings was performed on August 20th, 22d, and 23d; that on the 21st, at the request of the libelee's agents, she went out near the Manchuria and left without doing anything; that her work was not of an extraordinary character, nor difficult, nor dangerous; that there was no general request on the part of the steamship's agents for the schooner to be ready at call during the 25th, 26th, or 27th; and that she was used merely as a matter of convenience, and not as a matter of necessity, there being other vessels available which could have done the same work.

The court below held that, inasmuch as the libelant's pleading did not allege nor call upon the libelee to meet a claim for salvage, no award could be made to the libelant upon salvage principles, however much the evidence might tend to show that the services rendered by the libelant were of a salvage nature—citing Simms v. Guthrie, 13 U. S. 18, 24, 3 L. Ed. 642; Crockett v. Lee, 20 U. S. 522, 524, 5 L. Ed. 513; Harrison v. Nixon, 34 U. S. 483, 503, 9 L. Ed. 201; Boone v. Chiles, 35 U. S. 176, 207, 9 L. Ed. 388; Hobson v. McArthur, 41 U. S. 180, 194, 10 L. Ed. 930; Eyre v. Potter, 56 U. S. 41, 55, 14 L. Ed. 592. At the same time it gave in its opinion and judgment "much weight" to the stranded condition of the Manchuria.

The libel charges that the Cummings was a steam schooner of about 79 tons, carrying a crew of 15 men, besides the master, and was staunch and in every way fitted for the transportation of passengers and cargo to and from the several ports in the island of Oahu, within the territory of Hawaii, and was of a value of about $15,000. The court awarded the libelant for the services rendered the aggregate sum of $3,183, made up of these items:

| | |
|---|---|
| For landing passengers..................................................... | $1,970 00 |
| Conveying valuables worth $75,000 to Honolulu.................... | 375 00 |
| Conveying 160 tons of passengers' baggage......................... | 640 00 |
| Carrying wrecking gear to Manchuria................................. | 98 00 |
| Attempt of August 21st to get to Manchuria......................... | 50 00 |
| Carrying supplies for Restorer and Manchuria...................... | 50 00 |

Since quantum meruit is the basis of the libelant's action, we are to inquire whether these allowances are, as appellant contends, excessive.

The record shows that the schooner Cummings was owned by the libelant, and that its principal business was the transportation of

freight between Honolulu and Waimanalo, which is the landing place for the libelant's plantation, and distant in a direct line about one mile from the place where the Manchuria was stranded, but about eight miles as boats are compelled to go because of the reef. The schooner also made trips to neighboring ports, and at times carried some passengers; the usual fare for such passengers from Waimanalo to Honolulu being $1. Ordinarily the schooner made two round trips a week; "emergency trips, five trips a week, when they are jammed with sugar at Waimanalo," said one of the libelant's agents, Mr. Whitney, testifying on its behalf. The Cummings was about to leave Honolulu for Waimanalo on one of its regular trips early in the morning of August 20th, when news was received there of the stranding of the Manchuria. With commendable promptness, Mr. Whitney directed the master of the schooner to proceed at once to the distressed ship, and render any and every possible service. Arriving there about 10 a. m., the service of the schooner was at once accepted by the ship for the landing of her cabin passengers and their hand baggage, to accomplish which the schooner was compelled to go to the starboard side of the Manchuria, which was the shore side as she lay upon the reef. The evidence tended to show, and the trial court found, that the water was at the time rough and boisterous, and, although the master of the schooner had long navigated and been familiar with the waters in the vicinity, it appears that he was not familiar with the character of the sea bottom on the lee side of the Manchuria, and did not take time to make soundings, but proceeded at once to tie up at the gangway of the ship and to take off 197 of her cabin passengers, with their hand baggage, and to land them at Waimanalo. The circumstances of this operation, as disclosed by the evidence, were such as clearly to justify the conclusion of the learned judge of the court below that they were "attended with enough uncertainty to include possible damage to the Cummings." Undoubtedly the service thus rendered by the Cummings was not only of a salvage nature, but highly commendable, and, if the pleadings permitted, should be allowed for on salvage principles. Even as the case is presented, this service may be justly and properly characterized, as it was by the libelant in the court below, as extraordinary, and may be properly compensated in that light.

No further service was rendered by the Cummings on the 20th of August, and the next day August 21st, while taking aboard sugar at Waimanalo in pursuance of her regular business, her captain received a note from the bookkeeper of the Waimanalo plantation to go to the Manchuria, and started to do so; but, on going outside the reef, and within about a mile of the stranded ship, the master of the schooner, according to his testimony, considered the water too rough, and proceeded to Honolulu, after stopping 15 or 20 minutes, "sizing up the situation." August 22d the Cummings again went to the Manchuria at the request of her agents, and took therefrom 80 tons of baggage and 26 boxes of valuables, of the agreed value of $75,000, consisting principally of watch cases and watch fixtures, which were liable to injury by salt water, and all of which valuables were turned over to the schooner by the ship upon the promise of the master of the schooner to deliver them safely at Honolulu, which he did on the same day.

The next day—August 23d—the Cummings, upon like request of the agents of the Manchuria, conveyed from Honolulu to the ship certain anchors, chains, and other salvage equipment, and carried back from the ship to Honolulu more of the baggage of the passengers, which the schooner there discharged the next day, to wit, August 24th. On August 24th the Cummings was sent by the libelant to Waimanalo on one of her regular trips for sugar, and in going carried to the Restorer some vegetables, washing, and ice, which the Cummings put on a launch at Waimanalo for the Restorer. And on August 28th the Cummings, in making one of her regular trips to Waimanalo, also took some provisions and washing to the Manchuria, which it delivered in the same way.

It is contended on the part of the libelant that from August 25th to August 27th, both inclusive, the schooner was held, upon the request of the agents of the Manchuria, by the libelant, on call. Since, as the court below found, the evidence does not show that the interruption of the Cummings' visits to other ports than Waimanalo caused any injury to the business of the libelant with such ports, or to its customers, and since it does show, as the court found, that during the period extending from August 24th to August 27th, both inclusive, the Cummings was sent by the libelant from Honolulu to Waimanalo in the transaction of the libelant's own business, it does not seem of importance to determine whether the fact be, as testified by Whitney, that the libelant was requested to hold the schooner on call during the 24th, 25th, 26th, and 27th of August, or whether the request of the libelee's agents was, as testified by McClanahan, that Mr. Whitney should keep the libelee advised as to when the schooner would not be available, and that in the absence of any notice from him the libelee was to assume that she was available.

The record shows that before the ship was salved the libelant presented to the agents of the Manchuria a bill for $4,000 for the services of the Cummings, therein stated to be "emergency services," the payment of which was refused on the ground that the demand was exorbitant. The record further shows that the usual charge of the Cummings for carrying passengers from Waimanalo to Honolulu was $1 each, and that its regularly established freight charges were but one-half of the allowances made by the court below for such services.

The services rendered by the Cummings on the first day—August 20th—were undoubtedly hazardous and extraordinary, and clearly entitled the libelant, even under its pleading, to a liberal allowance. But we do not think, in view of the record, that the same can be justly affirmed of the subsequent services of the schooner. Mr. Whitney, who was the libelant's superintendent at Honolulu, gave testimony in respect to his inquiries of the master of the schooner concerning the hazardous nature of her first day's services, and also in respect to his instructions to the master regarding the subsequent services. He was questioned and answered as follows:

"Q. Did he [the master of the schooner] say anything else about the hazardous character of the service, other than it was hazardous? A. I asked him, 'Did you get alongside the ship safely without any bumping, or anything of that kind?' and he said, 'Yes,' but he said, 'It was tricky work when I

went round the bow,' and I said, 'How did you get out?' He said, 'round the bow,' and I said, 'How could you get round her bow, when I understand it she is high and dry forward and the breakers round her?' He said there was sufficient water for him to get round, instead of having to turn round and back out. 'Well,' I said, 'don't take any chances any more.' I said, 'If you are going alongside the ship again, you be careful in your judgment, that you do not lose the steamer Cummings.' Q. Is that all he said to you about the hazardous character of the service? A. We had a long conversation about the taking of the passengers on board, and the difficulty he had in getting them off the ship; that they insisted on crowding them down the gangway, and he said it was only by the utmost exertion on his part and his officers that they could keep them from crowding down and tumbling off the gangway; and that he had to call to the mate several times to stop the passengers from coming down, as they were only endangering their lives by crowding them down, and that they were getting more than he could carry. I said, 'How many did you bring the first load?' and he said, 'About 100—half the passengers,' and I said, 'Do you think it is safe now for you to go alongside that ship any more, considering the position she is in?' and he said, 'Yes; by careful handling I can get alongside all right.' 'Well,' I said, 'if it breaks any more round her stern, don't you do it, whether your judgment tells you to or not. Don't take any chance that is endangering the vessel in any way, because, if we lose that steamer, we lose her insurance and the hull to the Waimanalo Plantation. They would be tied up with sugar, and they would be in a devil of a fix.', That is just about the way I put it."

It thus appears that the schooner was specifically directed by Whitney not to take any risk in rendering any subsequent service. Moreover, it appears that after the first day's service of the Cummings it was distinctly understood between the representatives of the respective parties that for any other or further service rendered by the schooner no extraordinary nor unusual charge should be made. Mr. McClanahan, who had charge of this particular business for the libelee, testified, among other things, that, in a conversation between him and Mr. Whitney, held on the 21st of August:

"The question of compensation for the use of the Cummings was then brought up, but no definite agreement arranged upon, Mr. Whitney sidetracking the subject-matter by saying generally that the amount of compensation was not in question at all, that the boat was at our disposal, and that there would be no question about the matter of charge. I am not attempting to give his exact words, for I don't remember them. The impression was conveyed, however, that compensation was a secondary matter, that they were only too glad to assist the Manchuria and Hackfeld & Co. in any way they could that would not interfere with the regular business of the Cummings."

In referring to the same conversation, Mr. Pfotenhauer, who was vice president of Hackfeld & Co., the Honolulu agents of the libelee, testified, among other things, as follows:

"Mr. Whitney came in and asked us if we wanted to have the steamer Cummings, and I didn't say whether we wanted her or not, and then he— Then I said, anyhow, 'What will you charge us for the service you might render us?' And he said, 'Never mind the charge; we won't charge you much. We will be very fair, and we don't want to make any money out of this business, because we are both in the steamship business, and the compensation will be a secondary consideration.'"

The witness Klebahn, who was the superintendent of the steamship department of Hackfeld & Co., testified to a conversation he had with Mr. Whitney the first time he went to the Manchuria, with reference to the Cummings, as follows:

"I asked him what his charge would be for the Cummings, and he told me, 'Don't bother your head about that; go ahead and use her, if we don't get a red cent for her.'"

On cross-examination by Mr. McClanahan, Mr. Whitney was questioned, and answered, among other things, as follows:

"Q. Did you have any conversation prior to going out there [to the Manchuria] with any one in Hackfeld & Co.'s about the charge? A. I think there was no mention of any charge made until you and Mr. Pfotenhauer and myself were talking, and I think mention was made of how much the service would be for what we had already performed, and I made the statement that as soon as you were through I would send in my bill. Q. You remember that conversation? A. Yes; that is as far as I remember. Q. Mr. Pfotenhauer and myself were present at that time? A. Yes. Q. It opened up by an inquiry as to what the charge would be? A. I cannot say how it arose. Q. At any rate, there was an inquiry what the charge would be? A. Yes. Q. And the result of the inquiry was nil? A. No definite answer. Q. That is, we got no definite answer from you? A. Not a bit. Q. But, on the contrary, you said you would make a charge when the service was completed? A. Yes; that I would render a bill for the service. Q. Now, this conversation, was it before or after the trip that you went out to the Manchuria? A. After the trip I made."

If the representative of the libelant entertained the intent to make any "emergency" or unusual charge for any services thereafter rendered by the Cummings, good faith required that the libelee be apprised of it. Pacific Mail Steamship Co. v. Commercial Pacific Cable Co., 173 Fed. 28, 44, 97 C. C. A. 346.

We are of opinion that for the services of the Cummings rendered subsequent to August 20th the libelant is entitled only to their actual value, based, not upon the theory that they were of any extraordinary nature, or rendered in the face of an emergency, but their reasonable value, considered with reference to like services rendered by the libelant under ordinary conditions.

Agreeing with the trial court, however, that the services of the schooner on the 20th of August were extraordinary and of a hazardous nature, we are of opinion that they should be compensated upon that basis—a liberal allowance for which we think is $1,000.

The cause is remanded, with directions to the court below to modify the judgment in accordance with the views herein indicated—each party to pay its own costs of this appeal.