### GOERZ v. BARSTOW et al.

(Circuit Court of Appeals, Fifth Circuit. October 1, 1906.)

No. 1,493.

1. MORTGAGES—IMPEACHMENT OF FORECLOSURE SALE—SANITY OF MORTGAGOR—EVIDENCE.

Evidence considered, and *held* not to establish the insanity or mental incapacity of a landowner at the time of making a mortgage on the land or at the time of its foreclosure and the sale of the land thereunder so as to afford ground for setting aside such sale.

**2. SAME—FORECLOSURE—SALE IN PARCELS—IRREGULARITY IN SALE—TITLE OF PURCHASER.**

On a sale of property under a judgment foreclosing a security deed, given under the law of Georgia, a sale in bulk, instead of in lots, following the description in the deed, is a matter within the control of the court, and at most an irregularity, which cannot be availed of in an outside attack on the title of the purchaser.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Mortgages, § 1559.]

**3. VENDOR AND PURCHASER—IMPEACHMENT OF PURCHASER'S TITLE FOR FRAUD —BONA FIDE PURCHASER.**

Where a woman who purchased real estate employed an attorney to pass upon the title and draw the deeds, she was not by reason of such fact chargeable with notice of any previous fraud on his part which might affect the title. so as to affect her standing as a bona fide purchaser, where she had in fact no knowledge that he ever had any connection with the property.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, §§ 491, 492; vol. 40, Cent. Dig. Principal and Agent, § 690.]

**4. SAME.**

The fact that a woman had dealt in a small way in real estate in the suburbs of a city does not render her chargeable with notice of fraud affecting the title of the grantors of similar property purchased by her because of the inadequacy of the price paid, where such price was four-fifths of the value of the land at the time, as alleged in the bill filed against her to recover the property on the ground of the fraud, nor is she chargeable with such notice because of a covenant by the grantor in her deed to protect her against lawsuits of which she had no actual knowledge.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, §§ 477, 481.]

Appeal from the Circuit Court of the United States for the Southern District of Georgia.

For opinion below, see 122 Fed. 140.

The bill in this case was brought by and in behalf of the heirs at law of Elias B. Barstow, who died intestate in Chatham county, Ga., in September, 1898. The scope of the bill is to recover three several tracts of land in and about the city of Savannah and an accounting for rents and profits, on the theory that Elias B. Barstow. the owner of these lands, was non compos before and from July 12, 1895, up to his death, and that the defendants, through fraudulent and illegal proceedings, had procured possession and titles to the same. The appeal in this case is by part of the defendants, and relates to only one of the tracts of land, and therefore a full description of all the pleadings and evidence is unnecessary.

In regard to the tract involved in this appeal, the bill charges:

"Second. Your orators further show that E. B. Barstow died on the ——— day of September, 1898, in Chatham county, Ga., intestate, and that on November 3, 1898, W. W. Gordon, Jr., was duly appointed and qualified as administrator to the estate of the said Elias B. Barstow as temporary administrator, and permanent letters of administration on said estate were issued to him by the ordinary of Chatham county, Ga., on December 19, 1898, and your orators show that W. W. Gordon, Jr., administrator, consents to the filing of this bill by your orators and the heirs at law of said E. B. Barstow, deceased, for the purpose of recovering certain real estate hereinafter more particularly described. Your orators show that the said estate is entirely solvent, and that it is not necessary for the administrator to take possession of the real estate sought to be recovered in this bill for the payment of any debts of the intestate or for any other purpose, and your orators show further that under the laws of Georgia real estate descends direct to the heirs at law.

"Third. Your orators further show that said E. B. Barstow inherited in fee simple a large amount of valuable property, including a tract of about 1,176 acres on Wilmington Island, Chatham county, and several tracts in the immediate vicinity and suburbs of the city of Savannah, Chatham county, Ga.; three of these tracts being the subject of this bill, and more particularly described as follows: 5, 8, 9, 13, 16, 17, 20, on Tebeau's map, dated February 28, 1894, each containing 5 acres, except lot 20, which contained 5.26; said 50.26 acres bounded as follows: 50.26 acres, consisting of and known as lots 1, 4; south by a 50-foot street as laid down in said map; east by Waters' road; north by a 30-foot street; on the west by land of ———— Smith, as marked in said plat—said map being of record in the office of the clerk of the superior court of Chatham county. The second tract, containing 67½ acres, more or less, lying near the city of Savannah, in Chatham county, Ga., and known and designated as lots 23, 26, 29, 32, 35, on the plan of the Norton tract, made March 12, 1869, recorded as '4H,' folio 18.' The third tract being 20 acres, more or less, near the city of Savannah, in Chatham county, state of Georgia, known and designated as lots 14, 15, 18, 19, on a plan of the Norton tract, made by the county surveyor; said tract of four lots being bounded north by a right of way designated in said plan, east by lot 11 of said plan, south by lands of McClesky, and on the west by lands of Hull.

"Fourth. Your orators show that about the 12th of June, 1895, said E. B. Barstow contracted with Isaac Beckett, agent for Harriet H. Burch, for a loan of $1,500, $1,000 of which was to be paid at once, and the remaining $500 a short time after, and that to secure said debts said E. B. Barstow executed a deed to Harriet H. Burch to the 50.26-acre tract hereinafter described: that on the execution of said security deed $1,000 in cash was paid to said Barstow according to said agreement.

"Fifth. Your orators show that said Barstow at and before the time of entering into this contract was deranged in his mental faculties, and did not have at that time sufficient amount of reason to be capable of knowing his real situation or condition, or of knowing or understanding clearly what he was doing or perceiving the effects of his acts. Your orators show that said E. B. Barstow was an old man, upwards of 60 years of age; that at and before the time of said contract, and afterwards, continuing to his death, his mind was greatly impaired and weakened, due in a large measure to the long-continued and excessive use of spirituous liquors; although possessed of large and valuable property, he was morally and physically incapable of managing his own affairs or in taking any care of himself personally; that, while owning these various tracts of land in and near the city of Savannah, he lived the life of a recluse on Wilmington Island, avoiding contact with his fellow men, without servants, and finally died alone and unattended at his home on said island on the ———— of September, 1898, intestate. Said Barstow had many insane delusions and personal traits, among them the delusion that his property was immensely valuable. He refused about the time of said contract with Burch a reasonable and bona fide offer of $20,000 for the property, the subject of this bill. He actually paid taxes on his property far above the taxable value of said property.

"Sixth. Your orators show that said Isaac Beckett is a lawyer, and money lender in the city of Savannah. During the transaction resulting in the same contract with Barstow, said Beckett became acquainted with said Barstow's physical condition and physical weakness and imbecility and conceived the scheme of wresting from said Barstow his valuable property for a nominal consideration, and as the scheme developed other defendants besides Harriet H. Burch and Isaac Beckett became connected with the illegal and inequitable transaction by the purchase of the respective tracts as herein set out; and all of said defendants purchased with notice of the rights and equities of said E. B. Barstow in these premises, and were speculating with their eyes open to the vices and imperfections of the title acquired by him to the said several tracts of land. This unlawful and fraudulent scheme to acquire Barstow's property for a nominal consideration was so far successful that within a year's time, from April 6, 1897, property reasonably and fairly worth $14,000 was sacrificed for less than $2,000. The

particular manner in which the gross frauds were carried out will appear by a recital of the facts of the various transactions.

"Seventh. Your orators further show unto your honors that said Isaac Beckett purposely delayed for an unreasonable time to pay the balance of the said $500 agreed to be loaned by said Burch, and in consequence of said delay said Barstow was unable to pay his taxes, and his property was levied on for the year of 189–; that the said levy on his property for taxes greatly inconvenienced and embarrassed said Barstow, and with the said levy against the property it was rendered more difficult to secure money with which to meet his taxes, and said Barstow finally failed to pay the principal or interest due on the Burch loan on the 12th day of June, 1896, whereupon the said Isaac Beckett filed suit in the city court of Savannah against said Barstow returnable to the July term of court, although the return day of said court was less than 14 days distant from the day when said suit was filed. Said suit went by default, and judgment was taken at the November term in favor of Harriet H. Burch for the principal sum of $1,500, $109.33 interest, $160.93 as attorney's fees, said attorney's fees being included in the judgment contrary to law, and no defense was filed in said suit; Isaac Beckett thus taking unconscionable advantage of said E. B. Barstow. Your orators further show that the said Isaac Beckett, in his anxiety to sell the property of said Barstow, advertised the same in the Press, a newspaper published in the city of Savannah, Chatham county, Ga., an insufficient length of time, and was about to sell the property under the Burch judgment, whereupon Joseph H. Cronk, attorney for Barstow, stopped the sale on the ground of insufficient advertisement. Still another levy under said judgment was made, which was set aside for the lack of a reconveyance deed. Finally, Thomas Sheftall, sheriff of the city court of Savannah, levied under the Burch execution, and sold on the 5th day of April, 1897, lots 1, 4, 5, 8, 9, 12, 13, 16, 17, 20, according to Tebeau's map, dated February 28, 1894, each containing five acres, except 20, which contained 5.26 acres and being 50.26 acres in all, situated and being in Chatham county, Ga., to Isaac Beckett, agent, for the sum of $500. Your orators show that said levy and sale were illegal, fraudulent, and void. The said Isaac Beckett could not lawfully bid at said sale in any capacity; he having been the attorney for the plaintiff in execution, said H. H. Burch. Said sale was further illegal, fraudulent, and void because it was an excessive levy and sale, and for inadequacy of consideration. The tract was easily capable of being subdivided, and could have been sold lot by lot, instead of which the tract of 50.26 was sold as a block for $500, when the same was easily and reasonably worth $5,000.

"Eight. Your orators further show that while said land was bid off for the nominal and grossly inadequate sum of $500 by Isaac Beckett, agent, and the whole amount in excess of the court costs should have been appropriated to the payment of the state and county taxes then due on said property, yet said Beckett unlawfully and fraudulently applied $160.93 of said $500 on account of his attorney's fees improperly entered up under the Burch mortgage; $76.75 of the same was applied to costs, and the balance, $262.32, should have been applied to part payment of taxes. Your orators further show that on April 13, 1897, the sheriff made a deed conveying the property to James V. Kennickell for $500. While it is usual and customary among the business men of Savannah to record deeds at once, said deed was not recorded until June 15, 1897. April 19, 1897, said Kennickell sold and conveyed ⅘ interest in said 56.26 acres to C. H. Dorsett, George H. Stone, W. W. Starr, and T. F. Gleason, Jr., for $1,400, which deed was not recorded until May 10, 1897. On the same date, April 19, 1897, Isaac Beckett furnished part of the funds for the transaction, and as executor of the estate of ———— Byrns, and loaned to said parties, Dorsett, Stone, Starr, Gleason, and Kennickell, $1,000. On March 21, 1898, said Kennickell sold and conveyed his remaining ⅕ interest in said tract to George Beckett, an attorney at law, and son of Isaac Beckett, for $350, being an equal proportionate amount with that paid by the other grantees for their respective interests; George Beckett at the same time assuming Kennickell's liability upon the Byrn's note and mortgage. This was recorded April 6, 1898. On April 14, 1898, Dorsett, Stone, Starr, Gleason, and George Beckett sold and conveyed ⅔ interest in said

tract of land to Adele M. Goerz for $2,500. On April 2, 1898, the same party sold and conveyed to said Adele M. Goerz the remaining ⅓ interest in said tract for $1,500; said deed containing a covenant to save her harmless against suits, taxes, etc., and said Adele M. Goerz is now in possession of said tract. Your orators show that said Kennickell, Dorsett, Stone, Starr, Gleason, and George Beckett were aware of Barstow's mental and physical condition, knew of these several schemes, and they had notice of Barstow's equitable interest in the said land. Dorsett was a real estate agent and acted as agent for Mrs. Burch, and well knew the real value of this land, and the greatly inadequate price for which it had been sold under the Burch judgment. George H. Stone was a physician, and was one of Barstow's nearest neighbors on Wilmington Island; and, with a full knowledge of Barstow's insanity, imbecility, and intemperance, he became a purchaser as above set out, with full knowledge of Barstow's rights and equities in the premises. These grantees knew that Isaac Beckett and George Beckett, his son, were engineering, aiding, and forwarding these sales and transactions, and Isaac Beckett and George Beckett were acting as agent and attorney at law for those various parties in these sales and transactions, and they were charged with notice of all Isaac Beckett's illegal acts, and knowledge that he had acquired in the transactions connected with this loan, and they entered into these transactions with their eyes fully open and willing to share in the fraudulent profits. Your orators further show that said Adele M. Goerz bought with notice, and that she was fully cognizant of the character of these transactions and sought to protect herself against the loss by the covenant in her deed against lawsuits and taxes. Your orators further show that the covenant in her deed alone was sufficient to put her upon inquiry.

\* \* \* \* \* \* \* \* \* \*

"Eleventh. Your orators show that during these sales and transactions by which said Barstow's property, worth upwards of $14,000, was sacrificed for less than $2,000, his estate was entirely solvent, owning property far in excess of all debts and liabilities against it, and any one of said tracts was readily worth more than the debts for which all these tracts were sold; but such was his mental incapacity that he was utterly defenseless against these repeated raids upon his property. He had quarreled with his attorney, Joseph H. Cronk, though said Cronk had rendered him efficient service. He was without immediate family to protect his interests, and his nearest relatives were residents of distant states, and there was no one to interpose in these transactions in his behalf.

"Twelfth. Your orators show that the circumstances of these transactions, the rapidity with which they were brought to sale by Burch and Beckett, and bid off in behalf of Burch and Beckett were calculated to, and did chill and suppress bidding on the part of the general public."

The original prayer of the bill covered, not only a recovery of the lands, but an accounting to the complainants for the rents and profits. Certain demurrers attacking the equity of the bill and the jurisdiction of the court were overruled upon a direction that all prayers looking to the recovery of money judgments should be stricken from the bill and the case be confined to the recovery of the property.

After the evidence was taken and a hearing and a reference to the special master, complainants were allowed to amend their bill by adding at the end of paragraph 8 the following: "(1) Your orators further show that in the said deeds to Adele M. Goerz, one of the defendants, made by her grantors above named and who are defendants herein, there are to her general covenants of warranty of title, and that, if title failed to her as to said lands or any part thereof, she, in law is entitled to have recourse against her said warrantors to the extent of the purchase money and interest thereon from the dates of said deeds; and, further, that, if in and by the terms of the decree in this case your orators be compelled to reimburse or make good the said Adele M. Goerz for such purchase money or any part thereof due to her by her said warrantors on failure of title, then and in any such event your orators are equitably entitled to be subrogated, to such extent, to all of her said rights against her said warrantors, jointly and severally, and to make them who would be ultimately liable immediately liable herein to your orators,

who shall have paid any such amounts to said Adele M. Goerz compulsorily. Your orators do not attach hereto copies of said deeds containing the said warranties for the reason that the originals are in evidence already in this cause, and to which the usual leave of reference is prayed as often as may be necessary"—and by enlarging the prayer by adding the following: "That your orators, if, in and by the decree in this cause, they shall be compelled to pay to said Adele M. Goerz any sum of money whatever in the way of reimbursement to her for any money which she may have paid out to her said grantors as purchase money for said lands, may be subrogated in the place of said Adele M. Goerz and against her said grantors, jointly and severally, who are defendants herein, under their covenants of warranty, and have decree against said defendants for all such sums, with interest, so to be paid by your said orators under said decree, to the end that, all parties being before the court in this equity cause, all rights may be adjudicated herein, and that all parties ultimately liable may be made immediately liable." Following this amendment, which substantially restored some of the accounting features stricken out at the time the demurrers were passed upon, there was a reference to the master for an accounting, and on his report exceptions were filed by most of the present appellants, which were overruled, and a final decree rendered, which, after decreeing that, "before and at the times of the several sales of said properties therein set out at and by which the title of the said Elias B. Barstow was sought to be divested, the mind of the said Elias B. Barstow had degenerated to the extent that he was wholly incompetent to protect his landed interests in the premises," proceeded further to decree as to these appellants:

"As to the remaining tract of land, to wit:

"All that certain lot, tract, or parcel of land situate, lying, and being in the city of Savannah county of Chatham, and state of Georgia, containing 50.26 acres, more or less, being known and designated on Tebeau's map, dated February 28, 1894, as lots Nos. 1, 4, 5, 8, 9, 12, 13, 16, 17, and 20; each said lot containing 5 acres, except lot No. 20, which contains 5.26 acres; said 10 lots as one body being bounded as follows: North by a 30-foot street; east by Waters' road; south by a 50-foot street, as laid down in said map, and west by lands of ——— Smith, as shown in said plan. It is decreed that the sale thereof, made by the sheriff of the city court of Savanah on April 6, 1897, to Isaac Beckett, agent, at and for the sum of $500, as well, also, the conveyance of said tract made on April 13, 1897, by said sheriff to J. V. Kinnickell, who was then and there acting for Isaac Beckett, he being the real purchaser and taking the title in the name of the said Kennickell, was and is null and void. And it is further decreed that the several sales and conveyances made thereafter by the said J. V. Kennickel, acting for and on behalf of the said Isaac Beckett, to Charles H. Dorsett, George H. Stone, W. W. Starr, Thomas F. Gleason, Jr., and George W. Beckett, defendants herein, the said George W. Beckett then and there representing, holding for, and taking title in his name for his father, Isaac Beckett, were and are null and void. And, further, that the sales made by Charles H. Dorsett, George H. Stone, W. W. Starr, Thomas F. Gleason, Jr., and George W. Beckett to Adele M. Goerz of, respectively, an undivided ⅔ and ⅓ interest in said 50.26-acre tract on April 4 and October 22, 1898, are hereby decreed to have been and to be null and void.

"It is further decreed that said complainants are entitled to redeem the said 50.26 acres of land and to become possessed of the same as owners in fee simple, freed and cleared of all claims of defendants in and upon the same, and that the said Adele M. Goerz is entitled to be paid by the said complainants the sums of money paid out by her, with interest thereon, from dates of purchases in the purchase of said land, at the rate of 7 per cent. per annum, as well, also, such sums of money as she may have paid out for taxes upon said property, less what she may have received as income therefrom, she at the same time accounting for and being debited with such sums of money as he may have received from sales of portions of said lands; that is to say, the net amount, as the result of such account, to be paid to said Adele M. Goerz by said complainants is decreed to be the sum of $4,182.14, with interest thereon from March 24, 1904, at the rate of 7 per cent. per annum. And it is further decreed: That, upon the payment of said sum of

money, said tract of land consisting of 50.26 acres, more or less, shall stand redeemed of and from the claim of title of said Adele M. Goerz in the same and shall be owned and possessed by complainants in fee simple, and that the said complainants are entitled to redeem the said tract of land, and to said end it is decreed that said complainants do pay on or before the 20th day of June, 1905, unto the solicitors of record of the said defendant, Adele M. Goerz, the sum of $4,182.14, with interest thereon from March 24, 1904, at the rate of 7 per cent. per annum, to date of payment, and the deeds held by the said Adele M. Goerz to said tract of land, as well as the deeds from the sheriff of the city court of Savannah to James V. Kennickell and the deeds from James V. Kinnickell to Charles H. Dorsett, George H. Stone, W. W. Starr, Thomas F. Gleason, Jr., and George W. Beckett, shall stand annulled; and, at the same time that the aforementioned payment shall be made to the said Adele M. Goerz, she, the said Adele M. Goerz, shall, and is hereby ordered to, execute and deliver unto complainants a quitclaim deed conveying to said complainants all the right, title, interest, estate, claim, and demand of said Adele M. Goerz as claimed by her in and to said land. The said quitclaim deed shall be prepared and presented to said defendant, through her solicitors of record herein, by complainants' solicitors. That the said respective conveyances made by the said Dorsett, Stone, Starr, Gleason, Jr., and Beckett on April 4 and October 22, 1898, to Adele M. Goerz, by which said tract of 50.26 acres was conveyed to her, contained covenants of general warranty of title, thereby making said grantors therein jointly and severally liable to said Adele M. Goerz for the purchase money, with interest, for dates of said conveyances; and, title in said Adele M. Goerz being decreed herein to have failed, the said grantors above named, who would have been ultimately liable jointly and severally under said covenants of warranty, are hereby decreed to be immediately liable to said complainants when they shall have paid, under the compulsion of this decree, the said purchase money and interest to said Adele M. Goerz.

And it is therefore adjudged and decreed that, in and by way of subrogation, the said complainants, upon compliance with this decree in making the said Adele M. Goerz whole in the premises, by paying her the amount of money hereinbefore directed to be paid unto her, do recover and have judgment against the following named defendants, agreeably with the opinion of the court handed down and filed March 17, 1905, sustaining the report of the standing master, except as modified in said opinion; that is to say: (a) Complainants are hereby awarded judgment against the following named defendants, jointly and severally, to wit: Charles H. Dorsett, W. W. Starr, Thomas F. Gleason, Jr., and Charles W. Saussy, administrator of the estate of George H. Stone, deceased, to be levied as to the latter, of the goods, chattels, lands, and tenements which were of said Stone deceased, now in said administrator's hands, or that may hereafter come into his hands to be administered, in the sum of $1,800, principal, being the profit made by them in their joint enterprise with interest on said principal sum to date of this decree, $844.72, and future interest on said principal sum of $1,800 at the rate of 7 per cent. per annum until paid. (b) As to George W. Beckett, who purchased for $350 an undivided one-fifth interest in and to the said lands which were sold to Mrs. Goerz, and who was acting for his father, Isaac Beckett, and is therefore not out anything, he should account to the complainants for this alleged consideration of $350, together with his profits, $450, and interest on both, and therefore judgment is hereby awarded against said George W. Beckett in the sum of $800, principal, $382.68, interest to date of this decree, and future interest on said $800 at 7 per centum per annum. (c) As to Isaac Beckett, complainants are entitled to secure from him the profit made by him in the sale of the Goerz land, namely $1,250, principal, besides interest thereon at 7 per cent. per annum, less, however, the interest on the sum of $500 paid by Kinnickell for him at sheriff's sale, aggregating $1,603. Therefore the complainants are hereby awarded judgment against said Isaac Beckett in the sum of $1,603. (d) It is further decreed that said complainants shall have execution against said defendants, respectively, for the sums of money herein before awarded."

This appeal is prosecuted by Adele M. Goerz and by her grantors, Charles H. Dorsett, W. W. Starr, Thomas F. Gleason, Jr., and George W. Beckett, against whom a decree for money was rendered. The assignment of errors, 26 in number, cover the overruling of the demurrer, exceptions to the amendment to the bill, the overruling of exceptions to the judgment of the special master, the findings against Mrs. Goerz, the findings against her grantors, and numerous holdings and findings in the written opinion of the court filed in the case.

Saml. B. Adams, for appellant.

Hugh V. Washington, Wm. Garrard, and P. W. Meldrim, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge (after stating the facts). Our view of the case on this limited appeal renders it unnecessary to pass upon all the matters covered by the assignments of error and argued so fully in the briefs, for we think the decision of the question whether Mrs. Goerz was or is an innocent purchaser of the tract of land claimed by her, and therefore entitled to the rights of an innocent purchaser, will settle this appeal.

The bill charges that at the time Barstow gave the security deed to Mrs. Burch on June 12, 1895, Barstow was deranged and incapable of managing his affairs. The evidence does not show such to be the case. The evidence does show that for some indefinite period before his decease Barstow was non compos mentis, but he was never interdicted, and there is no reliable evidence in the record to show at what time his full incapacity to manage his affairs commenced or to show that at the time he gave the security deed to Mrs. Burch he was non compos. In fact, the undisputed evidence shows the contrary. Nor is there reliable evidence in the record to show that at the time of the judicial sale of April 5, 1897, under foreclosure of the Burch security deed was he at all times or at that time non compos. The most that can be considered as proved as to his condition of mind about that time is that, when under the influence of liquor and for times succeeding, he behaved in such besotted and fantastic ways as to justify the conclusion that he was then insane; but the evidence clearly shows that about the time of the sheriff's sale on Mrs. Burch's judgment he had long lucid intervals, in which he attended to business and was capable of attending to and managing his own affairs. We do not find any evidence or circumstances in the case to throw doubt upon or otherwise discredit the evidence of Mr. Cronk, a respectable member of the bar, and who up to and after the sale in question was Barstow's attorney apparently representing Barstow's interests with ability and fidelity. Mr. Cronk testifies:

"I was admitted to the bar in December, 1878, and have since practiced law in Savannah.

"Q. Do you recollect this paper shown to you? and, if you do, please state all you know about it.

"A. Mr. Barstow was a client of the firm of Norwood & Cronk in 1894, and was a client of mine in 1895, 1896, and a part of 1897. I think it was the

latter part of May, 1895, he called at my office and stated he was badly in need of money, and had made efforts to secure a loan from numbers of money lenders in Savannah. I asked him if he had made application to Mr. Isaac Beckett, who I knew was then lending money for some clients of his. He answered 'No.' I told him, if he did not wish to call Mr. Beckett, I would, as an act of friendship for him, do so. He assented. I immediately called on Mr. Isaac Beckett, and Mr. Beckett stated to me that before he made the loan he would ascertain from Mr. Charles H. Dorsett whether the particular land included in this deed to secure debt was ample security for a loan of $1,500, which was the amount that Mr. Barstow wanted. Later Mr. Beckett informed me that Mr. Dorsett considered the land ample security, and he would make the loan. A few days before this paper was executed Mr. Beckett was in my office, and stated that he did not have as much as $1,500 then in hand, but thought he would have the full amount one or two months later, and that, if I wished the paper to be drawn as this paper is drawn, he would draft it and be ready to have it executed on the 12th of June, the date of this paper. I stated to Mr. Beckett that I could give him no instructions as to how to draw the paper or for the amount, because I was not acting as attorney in the matter for Mr. Barstow, but simply as a friend; that he might draw the paper, if he saw fit, this way and leave it exclusively to Mr. Barstow to say whether he would accept this amount and execute the paper. When Mr. Beckett informed me of the date he was ready to pay this amount if Mr. Barstow wanted it, I wrote a letter to Mr. Barstow, and he came to my office on the day this paper was executed. He and I called at Mr. Beckett's office together. Mr. Beckett then handed to me to read this paper for the first time. I read it over first, and then read it aloud to Mr. Barstow. Mr. Beckett showed me a bank book, and also Mr. Barstow, that he did not have the full $1,500 then in bank to the credit of Mrs. Burch, and I then stated to Mr. Barstow it was left entirely for him to say whether he was willing to accept the $1,000 cash, and the other small sums later on, as specified in this paper. Mr. Beckett was asked how much longer Mr. Barstow would have to wait for the additional money, and I understood Mr. Beckett to say positively in a month or two he would have the additional $500. Mr. Barstow thereupon stated that he would execute the paper, and the paper was executed in Mr. Beckett's office, and I witnessed it, and the $1,000 was then handed to Mr. Barstow. So far as the additional sums are concerned, I do not know when they were paid, and, in fact, do not know personally that they were paid at all.

"Q. You never heard from Barstow when they were paid?

"A. He never reported to me at the times he received the additional money, but he subsequently informed me that he had received $1,500.

*   *   *   *   *   *   *   *   *   *

"Q. Mr. Cronk, will you state what was the mental condition of Mr. Barstow at this time and what your means of information are?

"A. As to his mental capacity?

"Q. His mental condition.

"A. Aside from meeting Mr. Barstow during the years 1894, 1895, 1896, and part of 1897 in the capacity of client, he often made calls otherwise to my office during these years. In that way I became pretty well acquainted with him. I never did regard him as an imbecile when not under the influence of liquor; and it was on very rare occasions I ever did see him under the influence of liquor. He was a clear-headed man, and a man of will. When under the influence of liquor, he was inclined to be erratic and quarrelsome. But I never regarded this eccentricity as insanity. He personally attended to all of his business with me. The southern tier of lots of this tract of land, south of Savannah, called the 'Norton tract,' was not covered by any mortgage or deed to secure debt. He arranged to sell off these lots, advertised the property, and made periodical visits to this place with a view of being on hand to meet prospective purchasers. He sold numbers of these lots personally. He got me to draw one or two deeds, and then finally concluded that he would get blank deeds and simply use one of the form deeds written by me and make all further deeds to future purchasers himself, and have them executed before two witnesses, one of them a notary public or justice of the

peace; thus showing, as I always believed, that he was fully capable of attending to his own business. If I had ever thought that Mr. Barstow was an insane man, nothing could ever have induced me to have filed a suit against him for attorney's fees.

"Q. After the interest became due did you ever have any conversation with him about paying this Burch debt? I say, after he gave this security deed, did you ever have any conversation with him about paying Mrs. Burch?

"A. You mean paying this debt?

"Q. Yes, sir.

"A. I do not remember that he did before he was sued for the debt. He called at my office in the summer of 1896, with a copy of a petition which had been filed by Mr. Beckett against him for the foreclosure of this deed to secure debt. Either the time of filing or the time of service on him was not within the time required by law. I advised him to file no defense to the paper, as Mr. Beckett could take no valid judgment against him at the July term of the city court, and in that way I think the petition went over to the November term. I then suggested to Mr. Barstow, as judgment could not be taken against him before November at least, that that would give him five or six months in which to endeavor to secure another loan to take up this one of Mrs. Burch. He stated that he had made efforts in Savannah heretofore to secure a loan, but that no one would loan him money, and he expected, if possible, to get a loan from a company either in Macon or in Atlanta, and with that in view he had gotten Mr. James K. Hines, of Atlanta, to examine the title to the property. Subsequently, and especially not long before the November term of the city court, Mr. Barstow frequently called at my office to consult with me about the suit brought by Mr. Beckett. He finally decided not to file any defense. It was during these visits that he informed me he could not secure a loan from the loan companies in Macon or Atlanta or from any individual. After his property was advertised for sale under the judgment procured by Mr. Isaac Beckett in favor of Mrs. Burch, Mr. Barstow called at my office quite often and was anxious to have the sale stayed. In the examination I made for Mr. Barstow, I found that the levy on the property preceded the actual record of the deed made back to him by Mrs. Burch. I therefore informed Mr. Barstow that a sale under the then existing levy and advertisement would be void, and that he could either let the sale go on or stop it by an affidavit of illegality on this as well as other grounds. He said he preferred not to get into expensive litigation with any third person about the property. It was therefore decided to stop the sale by an affidavit of illegality, which was done. Afterwards a second levy was made and the property advertised for sale, I think, in March, 1897. As the affidavit of illegality was pending and the execution had been withdrawn to make the second levy without an order of court, I also stopped this second sale. The only ground of the affidavit of illegality which was then left for a decision of the court was on the question of attorney's fees, which the court decided in favor of Mr. Beckett. Having no authority from Mr. Barstow, I did not carry this question to the Supreme Court. The property was then readvertised the third time, and subsequently sold by the sheriff of the city court.

"Q. Was anything said to you about his paying the interest and the debt being allowed to run on? Was anything said to you by Mr. Beckett about the interest being paid and the debt running on?

"A. He never said anything to me about having paid any interest.

"Q. Did you ever tell Mr. Barstow that, if he would pay up the interest, he would be indulged as to the principal?

"A. All that I know is that Mr. Beckett informed me that if Barstow would pay the interest that the principal could run on, but Mr. Beckett did not state definitely how long the principal could run on. That I communicated to Mr. Barstow.

"Q. How did you come to sue him, and what for?

"A. My suit?

"Q. Yes.

"A. That suit was for fees; the first item being for professional services prior to, I think, the first part of July, 1896, and for additional services running on to date on March, 1897. After this latter service was near-

ly completed Mr. Barstow asked me to let him take from my possession certain papers which Mr. Rad Saussy, as attorney for the county commissioners, had left with me to get him to nominate a commissioner, a blank being left in the paper for the commissioner's name to be filled in, and which paper was the original for condemnation of some land of Mr. Barstow under a second proceeding for that purpose. I told Mr. Barstow that I could not allow him to take the paper from my office. He asked why. I told him simply because it was an office paper that had been intrusted to me by Mr. Saussy for one purpose only, and, if he would name his commissioner, I would fill the name in and return the paper immediately to Mr. Saussy. He stated 'No'; that he wanted to carry the paper off for a short while and would bring it back. I declined to let him have that paper. Then he got mad with me and left my office, and I could get no answer from him about paying me up these back fees. I wrote him numbers of letters and tried to conciliate him, but he never after that had anything to say to me, nor did he answer any letters of mine, nor did he ever come to my office again."

As there is no evidence to show that at the time of the sale Barstow was under the influence of a drunken spree or suffering from the effects thereof, or suffering any other mental derangement incapacitating him, we consider that, in the light of Cronk's evidence, there was nothing in Barstow's mental condition to in anywise affect the validity and conclusiveness of the security deed of June 12, 1895, the judgment rendered thereon in the city court of Savannah, or of the judicial sale of April 5, 1895, based on the said judgment. If that sale is impeachable, it must be for fraud or for matters apparent on the record. The incipient conspiracy and fraud charged in the bill in relation to the security deed and the proceedings to foreclose the same are not established by evidence sufficient to warrant a decree against Beckett and the purchaser at the sale of this tract. It is only in the sales and dealings with other Barstow lands and in subsequent transactions that these parties may have become involved so as to make them responsible in equity.

As to the proceedings in execution apparent of record, it is sufficient to say that the levy was co-extensive with the security deed (see Reeves v. Bolles, 95 Ga. 404, 22 S. E. 626), and, if the property was not sold in lots following the description in the security deed, it was a matter within the control of the court whose judgment was being executed (Rorer on Sales, § 714, p. 290); and at the worst was an irregularity not available in any outside attack on the title transferred by the sale. As Barstow was not insane at the time he executed the security deed, nor shown to be insane at the time of the judicial sale—on the contrary, then having long lucid intervals if ever before insane—the judicial sale of the 50.26 tract was not void, at worst voidable, and is only impeachable, if it is impeachable at all (as to which we do not decide), for fraud, we think it clear that the appellant, Mrs. Goerz, has the right to invoke section 3540 of the Code of 1895 of Georgia, reading:

"A title obtained by fraud, though voidable in the vendee will be protected in a bona fide purchaser without notice."

The bill charges:

"Your orators further show that said Adele M. Goerz bought with notice, and that she was fully cognizant of the character of these transactions and sought to protect herself against the loss by the covenant in her deed against

lawsuits and taxes. Your orators further show that the covenant in her deed alone was sufficient to put her upon inquiry."

There is no evidence in the record to support this charge, except that her deed contained a covenant of protection against loss from lawsuits and taxes, and as to this covenant it is admitted that it was a part of the printed form of deed used, and the evidence shows that printed forms of deed with such covenant were in use by not only Mr. Beckett, who drafted the deed for Mrs. Goerz, but by other members of the Savannah bar. To an unprofessional person like Mrs. Goerz such a provision would have no significance. Mrs. Goerz's uncontradicted evidence is that, in 1866 being left a widow with a small capital of $1,800, she soon invested in lots in the southwest section of the city, holding them for a while and then selling with a profit, and has followed that business ever since, dealing with Dorsett and other real estate agents. As to how she bought and paid for the tract in question, she testifies:

"Q. Now, Mrs. Goerz, will you please explain how you came to buy this property?

"A. Well, as I stated before that I have dealt in and sold real estate, and I had some cash money on hand which I thought I might invest, I not only went to Mr. Dorsett's office, but to different other brokers to find what real estate they had on their books and what they just had at that time of houses, etc. I could not see anything I wanted, and I went to Mr. Dorsett and asked him if he had lots or anything on hand, and he mentioned several, which I cannot just now state all what it was, and also a tract of land. As I never purchased anything without looking at it, he agreed to take me out, and came to my house with a hack, and we went out for me to see the land, and I looked at it and came back to the city and thought there might be something, a little, in it, and that is how I came to purchase it.

"Q. Did you look at it with Mr. Dorsett?

"A. Yes; with Mr. Dorsett out in the hack, just like he would any other——

"Q. Did you agree with Mr. Dorsett on what you were to pay for it?

"A. Not right then. We did not agree on a price. I went back in a day or two because the price was more money than I had on hand, and I wanted to see just how I would get my money together.

"Q. Just explain—go on in your own way, Mrs. Goerz. Did you or not understand that Mr. Dorsett was one of the owners of the property?

"A. I asked him then who I was buying from, and he says, 'Well, from a syndicate.' and I said, 'Who are they?' and he said 'I am one,' but that was on the way going out, and he probably would have said the others but there was a buggy coming towards the city and the party in there bowed, and that interfered with the conversation, and we never renewed it, because generally I am not in the habit of asking who the party is that I buy from, since I have a lawyer afterwards to see my titles.

"Q. You understood Mr. Dorsett was one?

"A. I understood he was one of the parties.

"Q. You been dealing with Mr. Dorsett a good many years?

"A. Yes: and when he said he was one that was sufficient for me, because I always found in all my dealings Mr. Dorsett perfectly reliable and all, and I did not inquire any further.

"Q. You had entire confidence?

"A. Entire confidence.

"Q. When did you first see these deeds, Mrs. Goerz?

"A. Well, I cannot really state the date, but I can explain how it is. I keep no regular bank account—never have. I have a book at the People's Saving & Loan Company, and people pay to me pay in there, and it is credited on the book, and, like all my transactions previously, the deeds when they were made out my lawyer sent them there. He sent them to the courthouse, and

from there they were sent to Mr. Dorsett's office. They paid for the recording of them and then kept them until I called for them, in the safe. So the deeds were there quite a while before I ever saw them—before I called for them. In fact, I never called for the deeds until I was served with paper in this suit.

"Q. Did you see the deeds yourself before you got notice of this suit brought by the Barstows against you and others?

"A. To the best of my knowledge I did not. Of course, time has gone off some, and it is hard just to state the exact point.

"Q. Are you positive that quite a long time elapsed before you saw the papers?

"A. Quite a long time; yes, sir.

"Q. You spoke about keeping money with the People's Saving & Loan Company and having your money transactions through that company. Is Mr. Dorsett president of the company—of the People's Saving & Loan Company?

"A. I think he is.

"Q. You understand that he is?

"A. I know he is one of the officers of the company.

"Q. Does that company have its place of business in the same place of business where Mr. Dorsett is?

"A. In the same place; that is the same place.

"Q. Now, you say the property is paid for?

"A. I paid $2,500 in money cash, and then had a note of $1,600 besides taken up, finishing paying the amount due for the property, for I paid $4,000 for it, and, of course, to explain that note of $1,600 the $100 additional I wanted for expenses, because it took all my ready money to pay for that property, to pay Mr. Beckett for papers made out, and such as that.

"Q. And other little incidental expenses?

"A. Yes, sir.

"Q. Did you then borrow $1,600?

"A. $1,600.

"Q. In order to enable you to pay for this property and some incidental expenses?

"A. Yes, sir.

"Q. Do you know from whom you borrowed?

"A. I borrowed from the People's Saving & Loan Company.

"Q. So that your money transactions were made through the company and through Mr. Dorsett?

"A. Yes, sir."

She testifies, further, that up to the time of hearing of this suit she did not know and had never heard that the property had ever belonged to Barstow, and had never heard or knew anything of Barstow.

As to Mr. Beckett's connection with her purchase, she testifies that he was the lawyer who drew the deeds for her; that she paid him for the service; that he had previously drawn titles for her; that she did not know that Beckett had ever had the property sold or had bought it in. She herself bought from a syndicate of which she only knew Dorsett. Throughout a lengthy and rigid cross-examination she answered fairly and fully, and we are impressed with the fact that in purchasing the property she was acting solely in her own interest, in honesty and good faith. It is true that in a small way she was a successful real estate dealer, and she had availed herself of the legal services of Isaac Beckett, who is charged in the bill with conceiving a conspiracy to defraud Barstow of his lands.

We are aware of no invidious legal presumptions affecting Mrs. Goerz's honesty and good faith to be invoked because she was a real estate dealer. Neither under the averments of the bill nor under the evidence can it be presumed that because Isaac Beckett was employed by

Mrs. Goerz to pass upon the title and draw the deeds she was charged with notice of the frauds theretofore attempted and perhaps committed by Beckett or within his previous knowledge. On principle and authority no such presumption can be indulged in. Pursley v. Stahley, 122 Ga. 362, 50 S. E. 139; American Surety Co. v. Pauly, 170 U. S. 165, 18 Sup. Ct. 552, 42 L. Ed. 977; Western Mortgage Co. v. Ganzer, 63 Fed. 650, 651, 11 C. C. A. 371. If Beckett's knowledge had been acquired after his employment by Mrs. Goerz, there might be a little more reason in charging her with the knowledge of her agent, but still a presumption that a man volunteers against his own interest a confession of his own rascality is not to be readily indulged in. The price Mrs. Goerz paid was not so inadequate as to put her on notice of any defect in the title. She paid $4,000, four-fifths of the value asserted in complainants' bill, and there is highly respectable authority for holding that complainants are estopped from denying the truth of their averments. See 1 Daniel, Chancery, 838. 832n. There is evidence in the record showing that in the opinion of certain real estate men the property was worth in 1897 about $10,000, but considering the history of cities like Savannah, and after the panic of 1893 and 1894 the unexampled prosperity of the country, getting well started in 1896 and 1897, and in view of the continued rise in suburban property near prosperous cities, the opinions of witnesses given now as to the values of vacant suburban property in 1897 are not as reliable in fixing values as would be evidence of actual transactions at the time.

In Eyre v. Potter, 15 How. 42–59, 14 L. Ed. 592, it is said:

"Again, it is ruled that inadequacy of consideration is not of itself a distinct principle of equity. The common law knows no such principle. The consideration, be it more or less, supports the contract. Common sense knows no such principle. The value of a thing is what it will produce, and it admits of no precise standard. One man in the disposal of his property may sell it for less than another would. If courts of equity were to unravel all these transactions, they would throw everything into confusion, and set afloat the contracts of mankind. Such a consequence would of itself be sufficient to show the injustice and impracticability of adopting the doctrine that mere inadequacy of consideration should form a distinct ground for relief. Still there may be such an unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition or some undue influence; and in such cases courts of equity ought to interfere upon satisfactory ground of fraud; but, then, such unconscionableness or such inadequacy should be made out, as would, to use an expressive phrase, shock the conscience, and amount in itself to conclusive and decisive evidence of fraud."

All elements of fraud eliminated, and, so far as Mrs. Goerz is concerned, she cannot under the evidence in this case be charged with any, certainly there is nothing in the price she paid for vacant suburban property, taxable, but producing no revenue, to "shock the conscience."

We have been referred to many adjudged cases to the effect that contracts with an insane person, though not interdicted or judicially declared incapable, are void, and to other cases to the effect that such contracts are voidable only. If absolutely void, the innocent purchaser cannot as such be protected, if voidable, the innocent purchaser may have a standing in equity. If the evidence in this case

established that Barstow was insane at the time the security deed was granted, or perhaps even at the time of the judicial sale of the 50.26 tract, our conclusion on this appeal might have been on other lines.

The appellant, Mrs. Goerz, is entitled to a reversal of the decree by the court below, and a remand of the case, with instructions to dismiss the bill so far as she is concerned. This conclusion renders necessary a reversal of the decree, and the dismissal of the bill against the other appellants, so far as they are charged with liability or decreed to pay moneys as the grantors of Mrs. Adele Goerz.

Decree accordingly.